**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I. a/s/o COREY NIHART AND KATIE NIHART, | Court File No.: 21-cv-01749-KMM-DJF |
| Plaintiff, | |
| vs. | |
| AMAZON.COM, INC., | **AMERICAN FAMILY'S MEMORANDUM IN OPPOSITION TO PECRON LLC'S MOTION FOR SUMMARY JUDGMENT** |
| and | |
| PECRON LLC, | |
| Defendants. | |

1

## **INTRODUCTION**

This is a very simple case. A solar-powered generator with the marking "Pecron" in multiple locations caused a fire in a shed at the home of Corey and Katie Nihart in Faribault, Minnesota. All other potential sources of the fire were ruled out by an electrical engineer and a certified fire investigator, both with significant experience. While the generator purchased on Amazon.com contained the brand name "Aieusny," Aieusny's communication with Amazon advised the product was manufactured by "Pecron LLC." Amazon then certified Pecron LLC (hereinafter "Pecron") as the manufacturer of the Aeiusny 400W Solar Generator Portable Power Station that caused the fire (hereinafter the "Generator"). Pecron LLC's website advertises for the entire world that it manufactures and sells power generators and its social media sites advertises it has done so since 2012. There is no other company named Pecron that manufactures or sells power generators and Pecron has not explained to the Court or any of the parties how its name ended up on a power generator it claims it did not manufacture, sell or distribute. Minnesota law and common sense provide the Plaintiff need not present any evidence other than (1) Defendant's name on the product and (2) the fact Defendant makes this exact type of product, to permit a jury to find the Defendant manufactured the product.

In addition, without taking the time to look at the product that caused the fire, look at the exemplar obtained by American Family's experts, depose American Family's experts about their investigation, or produce any expert report identifying alternative causes of the fire, Pecron now seeks to discredit the investigation performed by American Family's experts and obtain summary judgment on additional bases related to their investigation. In so doing, Pecron presents an entirely incomplete record to the Court. Pecron repeatedly states there is "no evidence," when in fact there is evidence and relies on law entirely distinguishable from this case. Because there **is**

2

evidence and for the additional reasons set forth below, American Family asks the Court deny the motion for summary judgment and order this case move forward to trial.

### RESPONSE TO PECRON'S STATEMENT OF UNDISPUTED FACTS

1.    American Family does not dispute this fact.

2.    American Family does not dispute this fact.

3.    American Family does not dispute it initially alleged Aieusny manufactured the generator.  American Family amended its allegations in the Amended Complaint, which is the operative pleading at this time.

4.    American Family disputes this fact only to the extent it suggests some limitation on what was produced by American Family.  The entire remains of the Generator and an exemplar were examined in a lab environment.

5.    American Family does not dispute this fact.

6.    American Family does not dispute this fact.

7.    American Family does not dispute this fact, nor does American Family believe representatives of Pecron LLC have information helpful to American Family's claims.

8.    See response to 7.

9.    American Family does not dispute this fact.

10.   American Family disputes this fact, noting the only evidence identified by Pecron to support this allegation is the self-serving affidavit of the sole member of Pecron LLC.

11.   American Family disputes this fact on the same basis it disputes paragraph 10.

12.   American Family does not dispute this fact.

## ADDITIONAL UNCONTROVERTED MATERIAL FACTS

1.      On January 2, 2021, a fire was discovered in a shed at the home owned by Corey and Katie Nihart.  (Declaration of Samantha Ellingson, Exh. 1, Expert Report of Luke Choudek at 1.)

2.      The fire originated in the northwest corner of the building, which contained various electrical items of interest.  (Ellingson Decl. Exh. 3, Expert Report of Douglas A. Noah at 4.) One of the items of interest was the Generator.  (*Id.*)

3.      On the day before the fire, Corey and Katie Nihart's 14-year-old son plugged a Vexilar battery charger into the Generator Corey Nihart had purchased on Amazon.com.  (*Id.* at 2.)

4.      Following the fire, American Family investigated the cause of the fire utilizing a certified fire investigator, Doug Noah, with Whitemore Fire Consultants, Inc. and Luke Choudek, an electrical engineer with Onsite Engineering.  (*Id.* at 2.)

5.      Prior to the first joint investigation of the fire scene, American Family notified several parties of the fire investigation, including Amazon and Shenzen Enyuda Technology Co. LTD d/b/a Aeiusny (hereinafter "Aeiusny"). (Affidavit of Teirney S. Christenson, ¶ 3, Exh. A.) American Family did not notify Pecron of the investigation because it was unaware of Pecron's involvement with the product prior to the scene investigation.  Neither Aeiusny nor Amazon attended the fire investigation, despite notice.  (Ellingson Decl. Exh. 3, Noah Report at 4.)

6.      On March 1, 2021, a joint laboratory examination was conducted to look at all the electrical items of interest collected from the scene, together with an exemplar of the Generator. (*Id.* at 6.) Once again, both Aeiusny and Amazon were invited to attend while Pecron was not, again because American Family was not aware of its involvement with the product at the time.

7.      Based on the lab exam, all electrical items other than the Generator were eliminated as a cause of the fire because the damage to the other electrical items is consistent with fire attack rather than being causative.  (*Id*.)

8.      The only ignition source for the fire was energy released from failed cells within the Generator.  (Ellingson Decl. Exh. 1, Choudek Report at 12.)

9.      The exemplar Generator obtained for the lab exam had the exact same configuration as the fire damaged Generator from the scene, including the same number of battery cells.  (*Id*. at 9.)

10.     The exemplar Generator was equipped with internal parts labeled with the word "Pecron" in two unique locations. (*Id.* at 10.)



*Figure 12 Pecron C500 heat sync*



*Figure 13 Pecron C500 PCB*

11.     Research conducted by electrical engineer Luke Choudek revealed the technology within the Generator presents a risk of fire, according to a research paper published by the National Fire Protection Association, which is entitled *Lithium-Ion Batteries Hazard and Use Assessment*.  (*Id.* at 11.)

12.     The National Fire Protection Association warns of the risk of thermal runaway fires (the type of fire that occurred here, in the opinion of Plaintiff's experts) in NFPA 921 – 2021 Edition at Section 9.13.  (*Id.* at 12.)

13.     The same chapter of NFPA 921 does not include similar warnings for nickel-based or lead acid-based battery technology, which could have been used as an alternative to the lithium-ion batteries. (*Id.* at 12.)

14.     NFPA 921 is considered a leading textbook on fire investigation not just within the fire investigation community, but also by many courts in the United States.  *See Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.,* 394 F.3d 1054, 1057–58 (8th Cir. 2005) ("[NFPA 921] qualifies as a reliable method endorsed by a professional organization.")

15.     The only opinion as to the cause of the fire offered by any expert is a thermal runaway failure within the Generator.  (Ellingson Decl. Exh. 1, Choudek Report at 11; Ellingson Decl. Exh. 3, Noah Report at 7.)

16.     Luke Choudek, an electrical engineer, opines in his report that this type of thermal runaway failure goes undetected when the battery charger and pack are not equipped with charge and discharge monitoring, a flaw in the design of the Generator.  (Ellingson Decl. Exh. 1, Choudek Report at 11.)

17.     American Family initiated this case against Amazon.com as the seller of the Generator on August 3, 2021.  (Dkt. No. 1.)

18.     On January 19, 2022, Amazon received information from Aieusny indicating Pecron LLC was the manufacturer of the Generator American Family contends caused the fire. (Dkt. No. 72.1, Exh. A.)

| | |
|---|---|
| **From:** | mousamuel@whitewoodlaw.com |
| **Sent:** | Wednesday, January 19, 2022 3:23 PM |
| **To:** | Campbell, Kathryn (CHI) |
| **Cc:** | Paine, Gretchen M. (SEA); Andrew (Andy) Crowder |
| **Subject:** | Re: Aieusny PI case |
| **Attachments:** | 恩宇达（AEIUSNY）供货商亚马逊资料 (1).docx; 20190906米阳c500采购; 米阳s200采购合同-354套.pdf; 20190708米阳采购合同C500.pdf |

Hello Counsel,

It was nice talking to you today.

AEISUNY's product is supplied and manufactured by Pecron LLC, which is an MN company.

19.     With the information from Aeisuny in January 2022, it provided copies of the business establishing a contractual relationship for the supply of generators between Shenzhen Pecron Technology Co., Ltd. and Aeiusny (through Aeiusny's Chinese affiliate, Shenzhen Enyuda Technology Co., Ltd.). (Dkt. No. 72.2, Ex. B.)

20.     Those documents indicated that, while Shenzhen Pecron Technology Co., Ltd. is the "Full Name of Supplier," the supplier was registered as "Pecron LLC" for purposes of sales on Amazon's website:

**Enyuda (AEIUSNY) Supplier Information**

**Full Name of Supplier:** Shenzhen Pecron Technology Co., Ltd.

**Supplier's Store Name Registered on Amazon:** PECRON LLC

**Brand Used by the Supplier on Amazon:** PECRON

(*Id*. at 7.)

21.   Included was the business license for Shenzhen Pecron Technology Co., Ltd., which indicated Shenzhen Pecron's legal representative was Pecron LLC's sole member Weixin Shi, a resident of the People's Republic of China:



**Business License** (Copy)

Unified Social Credit Code 9144030059776626XC

| | |
|---|---|
| **Name** | Shenzhen Pecron Technology Co., Ltd. |
| **Type of Entity** | Limited liability company |
| **Domicile** | 3F, Building 1-2, No. 348, Ainan Road, Longgang Subdistrict, Longgang District, Shenzhen |
| **Legal Representative** | Shi Weixin |
| **Date of Establishment** | June 5, 2012 |

(*Id.* at 2.)

22.     Based on that information and its own investigation, Amazon certified Pecron as the manufacturer of the Generator.[1]  (Dkt. No. 29.)

23.     According to Pecron LLC's website, it was founded in 2012:



(Available at  https://www.pecron.com/pages/about-us,  accessed  on  July  19,  2023  and previously.)

24.     Additionally, Pecron's social media promoted its 11-year anniversary this year (2023):

---

[1] Amazon has since withdrawn this certification, but as set forth in its response to Pecron's Motion for Sanctions, it did so only in an attempt to extricate itself from the lawsuit.  (Dkt. No. 99 at 9.) American Family does not read its withdrawal as any type of agreement by Amazon that Pecron did not manufacture the Generator. (*Id.*)



(Available at https://www.facebook.com/pecron.official/, accessed on July 19, 2023 and previously.)

25.     On November 13, 2019, Pecron LLC posted a promotional video to YouTube, which shows a generator had already been manufactured and in use on the same date Pecron LLC filed its paperwork to register with the State of Minnesota: https://www.youtube.com/watch?v=hQn-r3Tpwn4. (*Id*. ¶ 7.)

26.     American Family added Pecron as a Defendant in this matter following the certification by Amazon, alleging it was the manufacturer and was involved in the selling, packaging and distributing products, including products like the Generator that caused the fire at the Nihart Residence. (Dkt. No. 30 at 5)

27.     American Family's list of witnesses in its 26(a)(1) disclosures lists representatives of Aeiusny and Amazon as individuals with relevant evidence. (Ellingson Decl. Exh. 2, American Family Mutual Insurance Company, S.I.'s Rule 26(a)(1) Initial Disclosures at 2) It is anticipated

these witnesses will testify in accordance with documents produced in the case that Pecron LLC was the manufacturer of the Generator.  (Dkt. No. 72.2, Ex. B.)

28.    In the course of litigation in this matter, Pecron never examined the Generator or the exemplar Generator, despite those items being available for examination at Onsite Engineering to this day.

29.    Pecron has not identified any expert witnesses in this matter and, therefore, can present no alternative theory as to the cause of the fire.

30.    Pecron has not certified another manufacturer of the Generator, nor does it have any explanation for how its name ended up on the exemplar Generator if it did not manufacture the Generator.

31.    Pecron's website states it manufactures and sells solar-powered and other generators.  (Dkt. No. 100, Declaration of Andrew J. Crowder at ¶ 20.)

32.    There is no other company named Pecron that is involved in the manufacture or sale of power generators based on any publicly available records. (Christenson Decl. ¶ 4.)

33.    American Family incorporates be reference here the entirety of its experts reports and all of the documents, facts and evidence relied upon by them as evidence American Family intends to introduce at trial.  (Ellingson Decl. Exh. 1, Choudek Report; Ellingson Decl. Exh. 3, Noah Report.)

**ARGUMENT**

I.   **Summary judgment standard requires this Court to evaluate whether a jury could find in favor of American Family if it viewed every fact and inference in the most favorable light for American Family.**

Summary judgment is not appropriate if the pleadings, discovery, and affidavits show a genuine dispute as to any material fact. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).  Similarly, a fact is material if its resolution affects the outcome of the case. *Id.*  In evaluating the facts and inferences that can be drawn from those facts to determine if there is a genuine dispute of material fact, the court must view everything in the light most favorable to American Family. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

II.   **Amended Complaint and the elements of claims brought by American Family.**

Pecron uses a significant portion of its memorandum exploring various issues it has with American Family's pleading.  American Family is opting not to address those issues in detail at this juncture, as the pleading gave reasonable notice to Pecron of the claims being asserted and, in any event, Pecron could have moved to dismiss under Rule 12(b), moved for a more definite statement under Rule 12(e), or used the discovery process to clarify the claims if it truly did not understand American Family allegations (which is doubtful).  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (stating that a pleading "does not need detailed factual allegations"); *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 805 (8th Cir. 2012) (observing that "specific facts are not necessary" and a complaint need only provide "fair notice of what the claim is and the grounds upon which it rests" (internal quotation marks omitted)).  It did none of those things.

In light of this, Pecron cannot use these criticisms at this later stage in the litigation to bar American Family from asserting its strict product liability claim against Pecron as a manufacturer and its negligence claim against Pecron as a distributor, for example.[2]  Nor can Pecron seek dismissal of the claims at this juncture on the basis the Amended Complaint did not clarify whether it brought design or manufacturing defect claims. Rather, American Family can continue to pursue any claims which have support in the evidence.

Under Minnesota law, the elements of a products liability claim are:

(1)    The product was in a defective condition unreasonably dangerous for its intended use;

(2)    The defect existed at the time the product left the defendant's control; and

(3)    The defect proximately caused the plaintiff's injury.

*Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 393 (Minn. Ct. App. 2004) (citing *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984)).

Similarly, to establish liability based upon negligence, a plaintiff must demonstrate:

(1)    the existence of a duty of care;

(2)    a breach of that duty;

(3)    an injury; and

(4)    that the breach of the duty of care was a proximate cause of the injury.

*Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). As explained by this Court previously:

> "If a dangerous manufacturing flaw existed and resulted from negligence, a plaintiff could in theory recover in negligence; if a dangerous flaw existed but did *not* result from negligence, a plaintiff could recover in strict

---

[2] The strict liability claim, for example, incorporates preceding paragraphs by reference such that it alleges from paragraph 8 that Pecron manufactured the Generator.  As such, a claim that Pecron is strictly liable for manufacturing the product was properly alleged and Pecron is on notice of such a claim.

> liability." *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1147 (D.
> Minn. 2011). Under either negligence or strict liability theories, the "crux
> of the claim is that the product, as provided to the public, was defective
> because the manufacturing, assembly, inspection, packaging or testing
> processes failed to turn out the product intended by the defendant
> manufacturer." *Johnson v. Zimmer, Inc.*, No. 02-1328, 2004 WL 742038,
> at         *10         (D.         Minn.         Mar.         31,         2004).

*McDougall v. CRC Indus., Inc.,* 523 F. Supp. 3d 1061, 1072 (D. Minn. 2021).

Here, American Family intends to present evidence that the cells in the Generator ruptured and caused the fire at the Nihart residence. (Ellingson Decl. Exh. 1, Choudek Report at 11; Ellingson Decl. Exh. 3, Noah Report at 7.) Based on literature identified by Luke Choudek, these ruptures occur due to cell manufacturing defects. (Ellingson Decl. Exh. 1, Choudek Report at 12.) He will also testify the use of different batteries or equipping the product with charge and discharge monitoring would have created a safer, viable alternative design for the product. (*Id.* at 11-12.) This is sufficient evidence to support the "crux of the claim" necessary to prove a negligence or strict product liability claim because it is evidence that "manufacturing, assembly, inspection, packaging or testing processes failed," as required by Minnesota law. *McDougall,* 523 F. Supp. 3d at 1072, citing *Johnson*, No. 02-1328, 2004 WL 742038, at *10. Either Pecron knew these battery cells could rupture and included them anyway (negligence) or did not know and they failed (strict liability). As such, the case is appropriate for trial and not summary judgment.

**III.    There is evidence upon which a jury could find Pecron was the manufacturer of the Generator and reason for a jury to doubt the veracity of Pecron's evidence it did not manufacture the Generator.**

In its memorandum, Pecron repeatedly and incorrectly claims there is "no evidence" Pecron was involved with the manufacture, sale or distribution of the Generator.[3]  Pecron Memo at 6-8.  This is simply untrue.  As set forth in the fact section above, there is significant evidence to at least create a genuine issue of material fact as to whether Pecron manufactured the Generator.  This evidence includes Pecron's name being on the product, Pecron selling and manufacturing this exact type of product, testimony from Aeiusny and Amazon representatives that Pecron made this product, and publicly-available evidence posted to the internet by Pecron.

In addition, Pecron's primary evidence to support its defense that it did not manufacture the Generator is an affidavit of questionable veracity. Pecron relies extensively and almost exclusively on the Declaration of Weixin Shi, its sole member, in its attempts to obtain dismissal of this lawsuit. This declaration, however, makes conclusory claims – claims which are called into question by evidence elsewhere in the record.  Specifically, while Weixin Shi states "Pecron LLC is not a manufacturer of products," Pecron's website specifically states "We design, engineer, produce, and sell all products ourselves – globally."  (Crowder Dec. ¶ 46.)  Similarly, while the Declaration states that Pecron does not "play any role in transmitting products that are branded or sold by other retailers, including Aeiusny," it does not explain how supplier information provided by Amazon contains the name PECRON LLC as the Supplier Store on

---

[3] In response to Pecron's argument at 5-6 of its Memorandum, American Family acknowledges it cannot maintain an action against Pecron if its involvement was solely related to "promoting" or "packaging" the Generator.  This allegation was made to identify that Pecron's involvement included placing its name on the product for purposes of promotion of Pecron as a company, not to expand Minnesota law on strict products liability.

Amazon for Enyuda (AIEUSNY) Supplier Information.  (*See* Dkt. 72.2.)  Lastly, and perhaps most importantly, the declaration does not explain how the word "Pecron" made its way onto the product at issue in two different places if Pecron, in fact, played no role in the production or sale of the product.  Ultimately, it would be reasonable for this Court, and any jury hearing this case, to disregard the Declaration of Weixin Shi and its contents entirely based on the factual discrepancies between the declaration and documentary evidence.

Moreover, the case law cited by Pecron in support of its position is misplaced.  In *Kladivo*, for example, a commercial seller was dismissed because the Plaintiff had filed a complaint against the manufacturer and the Court could not determine the Plaintiff would be unable to satisfy a judgment or settlement against the manufacturer.  *Kladivo v. Sportsstuff, Inc.*, Civil No. 06-4924 (JRT/RLE), at *7 (D. Minn. Sep. 2, 2008).  Similarly, *Roufs* was a multi-party case in which several parties were dismissed on various bases, but none of which are relevant here. One party was dismissed because the quick coupler the Plaintiff alleged that party manufactured could not be located. *Roufs v. AG Sys., Inc.,* No. C0-97-1478, 1998 WL 171438, at *4 (Minn. Ct. App. Apr. 14, 1998).  The other manufacturer involved in the case was dismissed specifically because there were "no identifying marks or numbers" on the product.  *Id.* at *2.  Neither of these things is true here and these cases are, therefore, insignificant at this juncture.

Similarly, the *Fine v. Schwinn* decision cited by Pecron addresses a situation entirely different from that here.  Specifically, in *Fine*, the Plaintiff sued Schwinn Cycling Fitness, Inc.*,* a successor company to Schwinn Bicycle Company, the manufacturer of the allegedly defective product. *Fine v. Schwinn Cycling Fitness, Inc.,* No. C3-00-1079, 2000 WL 1869552, at *5 (Minn. Ct. App. Dec. 26, 2000). Based on an analysis of the purchase documents and law, the court there determined that Schwinn Cycling was an entirely separate business from Schwinn Bicycle and

did not assume the liabilities of the first company.  *Id.*  The case did not hold a defendant can never be liable as a matter of law if it did not file incorporation paperwork prior to the date of the alleged wrongdoing.  Indeed, courts have recognized that the time of filing paperwork with the State is not always the first date in which a company engages in business. *See Rees v. Mosaic Technologies, Inc.*, 742 F.2d 765, 768-69 (3d. Cir. 1984), citations omitted (recognizing the liability of a corporation can be based on pre-incorporation acts).

Here, it is clear Pecron was manufacturing products prior to filing its incorporation paperwork.  Pecron advertises itself to United States consumers as a company "in existence since 2012" and celebrating its 11th anniversary.  In addition, Pecron had generators available for use in a social media video posted on the same day it filed its incorporation paperwork, providing evidence Pecron was manufacturing the generators prior to that date.  Meanwhile, it argues to this Court it could not have possibly manufactured a product in 2019 because it did not yet file paperwork with the State of Minnesota.  From a public policy perspective, Pecron should not be allowed to "have its cake and eat it too" by advertising how long it has been in business while asking the Court to find it cannot be liable because it was not in business.  As such, this Court should permit a jury to determine if Pecron manufactured the Generator and should not make this decision as a matter of law.

## IV.    Pecron has not certified the correct manufacturer of the product or identified a plausible alternative manufacturer.

As this court is aware, common-law principles of strict products liability allow a plaintiff injured by a defective product in Minnesota to sue not only the manufacturer, but also the commercial seller or distributor of the product, on a strict products liability theory.  *In re Shigellosis Litigation,* 647 N.W.2d 1, 5-6 (Minn. App. 2002), *review denied* (Minn. Aug. 20,

2002). A key rationale and public policy for strict liability in tort is to shift the risk bearing away from consumers who are harmed by products and toward those who profited from the product. *Id.* at 6.  The faultless party, then, is entitled to seek and recover indemnity from the actual defect-causing manufacturer. *Id.* (citing *Farr v. Armstrong Rubber Co.*, 179 N.W.2d 63, 68 (1970) (citing Restatement (Second) of Torts § 402A (1965) (noting an innocent party may recovery indemnity from the manufacturer who furnished the defective product).

In keeping with this strict product liability scheme, Minnesota statutes provide a mechanism by which the seller or distributor can extricate itself from the lawsuit by certifying the identity of the manufacturer.  Minn. Stat. 544.41.  American Family alleged Pecron was involved in the sales and distribution of the product to provide a mechanism upon which Pecron could escape liability if it was (as it claims) not the manufacturer.  Pecron, however, has not followed the requirements of the statute to certify the manufacturer, which it is required to do if it is aware of the identity of the manufacturer after being sued for its status as a seller or distributor.  *State Farm Fire & Cas. Co. v. Homewerks Worldwide, LLC*, No. A16-1925, 2017 Minn. App. Unpub. LEXIS 673, at *8 (Minn. Ct. App. Aug. 14, 2017) (holding where party failed to file affidavit identifying manufacturer, party had no basis for obtaining dismissal under Minn. Stat. Sec. 544.41).  Indeed, the *State Farm v. Homewerks* case is very instructive in evaluating the present matter, as the factual scenario is identical.

In *Homewerks*, State Farm initiated a strict products liability suit against Homewerks after a valve caused damage to a home insured by State Farm.  *Id.* at *2.  Its basis for suing Homewerks was the fact the word "Homewerks" was branded on the product.  *Id.*  State Farm's complaint alleged Homewerks was both the manufacturer and distributor of the valve.  *Id.*  In its answer, Homewerks denied manufacturing the valve and even identified the party that did manufacture

19

the valve, but never filed a certification identifying the party that manufactured the product. *Id.* Homewerks eventually filed a certification, mere days before the pretrial conference, but the court refused to allow Homewerks out of the case at that late juncture and the case proceeded to trial. *Id.* at *3.

On appeal, the Minnesota Court of Appeals rejected all of Homewerks' arguments and upheld the trial court's decision to allow the case to proceed to trial. After agreeing with the trial court that Homewerks had failed to comply with Minnesota statutes to certify the manufacturer, the Court went further and evaluated the evidence State Farm introduced to establish it was Homewerk's product and had been in Homewerk's control. *Id.* at *6-7, 9. The ONLY evidence referenced by the Court of Appeals to support that finding was: "State Farm offered photographs showing that Homewerk's name is printed on the valve." *Id.* at *10. If this evidence is sufficient to support a jury's verdict that Homewerks controlled the product, the photos of Pecron's name on the product in two different locations are sufficient evidence to support a verdict here.

Beyond that, Pecron has not provided a plausible alternative explanation for the word "Pecron" being stamped on the product in two different locations. Nothing in its 26(a)(1) disclosures identified another "Pecron" company that could have been involved with the product, despite a requirement that it produce all documents in its possession, custody or control that it may use to supports its defenses. Rule 26(a)(1)(ii). Moreover, every representation made by Pecron online suggests that it is, in fact, in the business of manufacturing generators of the type at issue in this lawsuit and there is no other company named "Pecron" or any variation of that word that manufactures generators. *See supra* at 8-10.

20

**V.    American Family has adequate proof upon which a jury can determine the Generator was defective, unreasonably dangerous when it left the control of Pecron, and caused the fire.**

Ordinarily, whether a product is defective is a question of fact.  *Thompson v. Hirano Tecseed Co.*, 456 F.3d 805, 809 (8th Cir. 2006).  It is only when reasonable minds cannot differ that the question is one of law.  *Id.*  As set forth above, American Family's experts will opine at trial this loss was caused by thermal runaway in a defective battery pack, in which alternative batteries or charge and discharge monitoring could have been utilized as a preventative measure. This is sufficient to create a question of fact as to both (1) whether the Generator was defective and (2) whether the defect caused the fire, especially where the Defendant has posited no alternative cause for the fire or produced an expert opinion that the product was not defective.

As to the second element (evidence the product was unreasonably dangerous when it left the control of Pecron), a plaintiff need only show the product reached the plaintiff without alterations or modifications "which defeat the safety which is engineered into the product." *O'Neal v. Remington Arms Co.*, 817 F.3d 1055, 1060 (8th Cir. 2015).  Here, there is no evidence the generator was modified in any way or misused by the Niharts.  For the reasons set forth above, it would be reasonable for a jury to find Pecron manufactured the Generator and it reached the Niharts without any changes. Absent some evidence of misuse, improper storage, or mishandling (there is none), a jury could conclude the product was unreasonably dangerous when it left the control of Pecron.

**VI.    Pecron's factual and legal arguments are flawed.**

Having set forth the evidence American Family intends to introduce at trial to prove its claims, American Family now turns to addressing some of the misstatements and flawed arguments in Pecron's Memorandum.[4]

At page 13, Pecron argues the exemplar contained six fewer lithium-ion batteries than the generator that caused the fire.  This is not accurate. Rather, American Family's investigators expressed concern at the fire scene because they only recovered 30 battery cells when literature suggested there should have been 36 battery cells. (Ellingson Decl. Exh. 1, Choudek Report at 4.) Upon obtaining the exemplar, however, the experts discovered the exemplar only had 30 battery cells, which confirmed the investigators had in fact recovered all of the battery cells from the Generator at the fire scene and the exemplar was the same product as the Generator that caused the fire.  *Id.* at 5.  Rather than showing a flaw in the work of American Family's experts, this highlights the thorough work performed by them and further bolsters the validity of the evidence American Family intends to present in this matter.

Similarly, on page 13, Pecron appears to suggest summary judgment is appropriate on the sole grounds that "the actual generator at issue cannot be located or analyzed."  American Family is hard pressed to understand what claim is being made here, as both the remains of the Generator and the exemplar have remained available for analysis at Onsite Engineering throughout the discovery process. Pecron never took advantage of the opportunity to examine any of this evidence, however, or introduce any expert opinions about the Generator, the exemplar, or an

---

[4] American Family is not responding to every case cited by Pecron as many of them are cited for basic propositions of product liability law.  American Family will attempt to respond to the most significant arguments and cases here.

alternative cause of the fire.  For these same reasons, Pecron's citation to *Roufs* in support of dismissal is irrelevant because the product in *Roufs* was actually missing.  Here, the product is not.

On page 14, Pecron argues American Family offers no expert testimony on any product defect, citing a case in which the Court had already granted *Daubert* motions to exclude the experts.  Pecron additionally argues American Family's experts have offered no reasonable design alternatives. Contrary to both of these arguments, Mr. Choudek very specifically explains in his report:

> If the battery charger and pack are not properly equipped with charge and discharge monitoring, a failure within a cell can go undetected. A failure within a cell can result in a thermal runaway scenario which can result in fire.

*Id.* at 11.  In other words, if the charger and pack *were* equipped with monitoring (an alternative design), this type of thermal runaway (which is well documented in fire protection literature) scenario is mitigated.  Additionally, he notes that while NFPA 921 contains a warning for lithium-ion batteries and their propensity to cause fires, no such warning exists for nickel-based or lead acid-based battery technology, thus providing another design alternative that, in his opinion, could have prevented this fire. *Id.* at 12.

On pages 15-16, Pecron attempts to make the case that Plaintiffs cannot prove there was no mishandling or improper storage of the product from the time it was manufactured until the date of loss.  This is also untrue.  Plaintiffs' witnesses here include the Niharts, who are prepared to testify about their use of the Generator from the time of purchase until the date of loss.  Pecron did not depose the Niharts in this action, and therefore, have no evidence there was any

mishandling or improper storage.  Moreover, Plaintiff's expert interviewed the Niharts about the use of the Generator and, based on information obtained from them, neither expert reached the conclusion there was mishandling or improper storage. (Ellingson Decl. Exh. 1, Choudek Report at 1, 12; Ellingson Decl. Exh. 3, Noah Report at 2.) Pecron has no experts prepared to testify as to what mishandling, improper storage, or other misuse may have led to this fire and, therefore, the Court should not grant summary judgment on this basis.

Pecron then relies extensively on a series of cases involving battery failures that predate the present action and the science related to batteries, and are factually and procedurally distinguishable.  To start, *Schanhaar v. EF Techs., Inc.* involved a lead-acid battery in which the court made a finding based on evidence in the record that the lead-acid battery was not unreasonably dangerous because it did not pose a danger beyond the contemplation of the ordinary consumer.  *Schanhaar v. EF Techs., Inc.,* No. CIV. 08-5382 ADM/LIB, 2010 WL 4056045, at *2 (D. Minn. Oct. 14, 2010). Here, Pecron has placed nothing in the record upon which this Court could make such a finding and, therefore, the *Schanhaar* case is entirely inapposite.  Similarly, the *Hope v. Hewlett-Packard* decision resulted in the Plaintiff's claims being dismissed because its own expert opined the laptop itself was defective and not the batteries, thus requiring dismissal of the battery manufacturer.

This matter is also distinguishable from the *Gopalratnam* case Pecron relies extensively upon on a number of levels:

- Procedurally, the Defendants in *Gopalratnam* had deposed the Plaintiff's experts and thoroughly explored both the opinions they planned to offer at trial and the bases for those opinions prior to seeking their exclusion via a *Daubert* motion. *Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 783-88 (7th Cir. 2017)

- The Defendants in *Gopalratnam* had also identified their own expert witnesses to challenge the testimony of the Plaintiff's experts and were not relying on the arguments of counsel to suggest the findings were somehow flawed. *Id.* at 785.

- One of the experts challenged by the Defendants was relying on his own article to support his conclusion, an article in which the expert's co-author had performed testing that did not support the expert's conclusion. *Id.*

- The *Gopalratnam* case involved batteries in a laptop, not a solar powered generator. In *Gopalratnam,* one of the articles relied upon by Plaintiff's expert was found to contradict his opinion specifically because tests were run on laptop battery packs that did not support his conclusion. *Id.* at 785-86. That article does not contain contradictory testing on Generators or associated battery packs.

- The *Gopalratnam* case also resulted from a 2010 fire, when research on lithium-ion batteries was not as well developed as it was in 2019, or at the present. *Id.* at 775. It is now well accepted not only in the scientific community but also in mainstream culture that lithium-ion batteries pose the risk of fire due to defects in their manufacture. *See Lithium-Ion Batteries Hazard and Use Assessment*, cited by Choudek; the 2021 version of NFPA 921, also cited by Choudek, which includes a new section on such batteries; and [https://www.faa.gov/newsroom/lithium-batteries-baggage#:~:text=Spare%20(uninstalled)%20lithium%20metal%20batteries,passenger%20in%20carry%2Don%20baggage](https://www.faa.gov/newsroom/lithium-batteries-baggage#:~:text=Spare%20(uninstalled)%20lithium%20metal%20batteries,passenger%20in%20carry%2Don%20baggage). (Federal Aviation Administration bulletin from February 4, 2020, disallowing lithium-ion batteries in checked baggage because "defective or recalled lithium batteries…are likely to be a safety concern by overheating or catching on fire" and stating "when in doubt, leave it out.")

As such, the "failure to bridge the analytical gap" that was present in *Gopalratnam* is not present here and Pecron's reliance on this case is misplaced.

Throughout its memorandum, Pecron at least suggests Plaintiff's claims should fail because the experts did not perform "fire testing." American Family assumes Pecron's position is that American Family's experts must replicate the exact failure mode of the Generator. Federal Courts have repeatedly recognized, however, that replication is not always necessary, or even

possible, and as long as an expert follows appropriate methodology within his field in reaching

his conclusions, the opinions are appropriate for trial:

> Mr. Martin explained that the presence of so many unknown variables precluded an effective replication of all conditions and activity involving the Terra Gator before and during the fire, such that the abrasion over time could be observed and tested. Mr. Martin based his opinions on his experience and expertise, as well as on his investigation, which eliminated other plausible causes for the fire. Again, Mr. Martin's method does not involve application of any controversial scientific process or theory, and the Daubert factors are of less utility.

*Farmland Mut. Ins. Co. v. AGCO Corp.,* 531 F. Supp. 2d 1301, 1306 (D. Kan. 2008); *see also*

*Am. Family Mut. Ins. Co. v. Hewlett-Packard Co.,* No. CIV. 07-792 ADM/AJB, 2008 WL

2130217, at *6 (D. Minn. May 19, 2008) (failure to replicate is not dispositive) and *Certain*

*Syndicate Subscribers to Down Side v. Lasko Prod., Inc.*, No. CIV-08-0220 MCA/DJS, 2010 WL

11507212, at *6 (D.N.M. Jan. 7, 2010), citing *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*,

979 F.2d 1434, 1442 (10th Cir. 1992) ("Typically, dissimilarities [between experimental and

actual conditions] go to the weight of the evidence rather than its admissibility.").

Lastly, Pecron's attempt to smear Luke Choudek based on a decision from over 20 years

ago excluding Daniel Choudek's testimony should be disregarded as irrelevant.  To start, the

decision in *Am. Fam. Ins. Grp. v. JVC Ams. Corp.* was based in part on Daniel Choudek testifying

as to the origin of the fire, without certification as a fire investigator.  No. 00-27 DSD/JMM, 2001

WL 1618454, at *3 (D. Minn. Apr. 30, 2001).  Here, Luke Choudek has relied on the expertise

of Douglas Noah, a CFI, as to the origin of the fire.  (Ellingson Decl. Exh. 1, Choudek Report at

2.) More importantly, however, the case referenced by Pecron is entirely unique from the present

case and was based on the testimony taken of Daniel Choudek by the Defendants in that case, of

which there is none in this case, because Pecron has not taken Luke Choudek's deposition.  *JVC*

*Ams. Corp.*, 2001 WL 1618454, at \*3-4.  More specifically, that court found Daniel Choudek cited no fire science textbooks, did not speak to the homeowners, made no attempt at independent research, and relied on tests of devices other than the one at issue in forming his conclusion.  *Id.* at \*4.  None of those issues are present here, so the Court should treat this argument as the red herring it is.

## CONCLUSION

American Family has sufficient evidence upon which a jury could find in its favor at trial on its strict product liability or negligence claim. Just as important, Pecron has introduced no alternative theory as to what caused the fire and damages at the property of Corey and Katie Nihart and has no expert to rebut the opinions presented by American Family's experts.  As such, summary judgment is inappropriate here and the Court should deny Pecron's motion.

Dated:  July 21, 2023.

**YOST & BAILL, LLP**

By: /s/ Teirney S. Christenson
Teirney S. Christenson (admitted pro hac vice)
David J. Yarosh (#184123)
220 South Sixth Street, Suite 2050
Minneapolis, MN 55402
(612) 338-6000
dyarosh@yostbaill.com
tchristenson@yostbaill.com